**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1071-16T4

LISA IPPOLITO,

      Plaintiff-Respondent,

v.

TOBIA IPPOLITO,

      Defendant-Appellant.

_____

Argued March 10, 2020 – Decided May 8, 2020

Before Judges Fisher, Accurso and Gilson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0147-13.

Tobia Ippolito, appellant, argued the cause pro se.[1]

William M. Laufer argued the cause for respondent (Laufer, Dalena, Jensen, Bradley & Doran, LLC, attorneys; William M. Laufer, of counsel and on the brief; Kimberly Gronau Boyd, on the brief).

---

[1] Alleging a need for an ADA accommodation, appellant was permitted to argue from a remote location by telephone.

PER CURIAM

# I

The parties – plaintiff Lisa Ippolito and defendant Tobia Ippolito – were married in 1989. As a managing director of Fortress Investment Group, a Wall Street firm managing more than $41 billion in assets, Tobia[2] earned a significant income that provided the family[3] with a lavish lifestyle.[4] But, when Lisa expressed an intention to seek a divorce, Tobia threatened to "spend every dime" and turn any matrimonial litigation into the "War of the Roses."[5] Undeterred, Lisa commenced this divorce action in July 2012.

After an eight-day trial that started in late 2015 and ended in early 2016 – at which Tobia neither testified nor called any expert witnesses – the trial court

---

[2] We refer to the parties by their first names not out of disrespect but to avoid confusion.

[3] The parties have three living children, born in 1995, 1997, and 1999. Their oldest child, who was born in 1994, is deceased.

[4] Besides their ownership of three homes, the parties had a number of luxury vehicles, such as a Porsche Carrera, Mercedes 550 class, Cadillac Escalade, and Audi A8. They had domestic help to assist with the maintenance of their properties, frequently dined out, shopped at high-end stores and boutiques, vacationed internationally at four-star resorts, and flew first class. They were also able to save in excess of $1,000,000 annually.

[5] The title of a 1989 film about a bitter divorce, starring Michael Douglas, Kathleen Turner, and Danny DeVito.

A-1071-16T4

rendered a final judgment on September 6, 2016. Among other things, the judgment: awarded Lisa sole legal and physical custody of the children; imputed income to Tobia in the amount of $2,500,000 annually; awarded Lisa $960,000 annually in open durational alimony; set Tobia's child support obligation at $10,000 per month; ordered the payment of arrearages and other credits; awarded Lisa counsel and expert fees in the amount of $1,183,923.50; equitably distributed the parties' assets by equally dividing the marital bank accounts, brokerage accounts, private equity accounts, and retirement assets; and, in most instances, transferred Tobia's share of the divided assets to Lisa to satisfy Tobia's outstanding support obligations.

Tobia appeals,[6] raising numerous issues for our consideration. We find no merit in his arguments and affirm. To explain our disposition, we find it necessary to provide first a brief synopsis of this matter's history.

_____

[6] Lisa filed a notice of cross-appeal, but later withdrew it. The bankruptcy trustee in Tobia's Chapter 7 proceeding also filed an appeal that was later voluntarily dismissed with prejudice. A few days before we heard oral argument in this matrimonial appeal, Tobia filed three motions. He sought to: vacate an order that had been entered more than two years earlier that suppressed his brief in the bankruptcy trustee's appeal; vacate the order confirming the trustee's voluntary dismissal of his appeal; and adjourn oral argument in the appeal at hand until we had an opportunity to rule on the other two motions. We expedited the adjournment motion and, by order entered on March 6, 2020, we denied that motion; we did, however, state that we would not file an opinion in this appeal

A-1071-16T4

II

Tobia did more than extensively litigate this matrimonial action or turn it into the "War of the Roses," as promised. He filed claims and made numerous applications in the United States District Court for the District of New Jersey and the United States Bankruptcy Court for the District of New Jersey, and filed appeals of orders entered in those matters in the United States Court of Appeals for the Third Circuit. He has filed several complaints against judges, who presided over or were tangentially involved in this matrimonial action, with the Advisory Committee on Judicial Conduct, more than a dozen complaints in municipal court, and eight applications for domestic violence restraining orders. So extensive and vexatious was his litigious conduct that, in June 2016, the vicinage assignment judge barred Tobia from filing any further applications without court approval. Except as they may relate to the matters raised on appeal, we will not further delve into those other matters but, instead, will turn to the prolonged proceedings in this case.

In August 2012, after this matrimonial action was commenced, the trial court enjoined Tobia from dissipating, transferring or depleting any marital

without having first ruled on the motions filed in the bankruptcy trustee's appeal. We have since denied those motions.

assets without Lisa's consent. Another order entered that month prohibited Tobia from interfering with the construction of the family's new home on Crestview Road in Mountain Lakes.[7] In September 2012, the court awarded the Crestview home to Lisa as an advance against her share of equitable distribution. In May 2013, the court ordered Tobia to pay Lisa $55,000 per month in pendente lite support and directed the sale of both their Mountain Lakes home on Cobb Road and their lake house in Hawley, Pennsylvania.[8] Tobia unsuccessfully sought our leave to allow interlocutory appeals of the September and November orders.

In February 2014, the trial judge ordered Tobia to cease his threatening communications to experts. The judge also commenced a contempt hearing in April 2014, in response to allegations that Tobia had contact with the court-appointed family therapist. The following month, the judge found Tobia in contempt and, among other things, ordered him to undergo a psychological evaluation. We granted Tobia's motion for leave to appeal and vacated the

---

[7] At trial, a real estate appraiser placed a fair market value of $2,300,000 on the 8000 square foot Crestview home, which had five bedrooms, eight bathrooms, an indoor basketball court, a dance room, a movie theater, and other luxury amenities.

[8] The judge determined at trial that the combined total from the sale of the Cobb Road home and the Pennsylvania lake home was $1,546,742.

contempt order on procedural grounds, remanding for the designation of another judge to preside over the contempt hearing. Ippolito v. Ippolito, 443 N.J. Super. 1 (App. Div. 2015). Apparently, the hearing never occurred.

In August 2014, Tobia's counsel was permitted to withdraw and the court placed an attorney's lien on Tobia's proceeds or property encompassed by this lawsuit in an amount in excess of $200,000. The judge also granted Tobia an advance of $150,000 on his ultimate share of equitable distribution to be used for the retention and payment of counsel and experts. At that time, $1,103,186.20 in proceeds from the sale of the Cobb Road property was being held in escrow. In December 2014, and January 2015, the trial court denied motions filed by Tobia seeking a release of additional funds from the marital estate for legal fees.[9]

In April 2015, we dismissed motions filed by Tobia in this court in which he sought, among other things, a change in venue. A few months later, Tobia

---

[9] In March 2015, Tobia wrote to the law firm representing Lisa and "[a]ll [the firm's] [p]artners, [e]mployees and their spouses, and un-named insurance companies" advising that he was "in the process of preparing a formal complaint [seeking] the amount of $19,464,206 in compensatory damages and $964,000,000 in punitive damages, plus un-quantified items, plus damages accruing."

moved in this court for leave to appeal an order entered at a case management conference. We denied that motion as well.

In October 2015, the trial judge enforced the pendente lite support obligations – the arrears were then in excess of $250,000 – by, among other things, setting dates by which Tobia would have to show "substantial compliance" and offer proof of the existence of a $3,500,000 life insurance policy. The order stated that upon Tobia's failure to comply, a warrant would issue for his arrest.[10] An order was entered a week later that denied Tobia's request for a hearing to ascertain his ability to pay and to address his indigency claim. Tobia filed a notice of appeal, seeking review of these two orders. We sua sponte dismissed the appeal because the orders were interlocutory and leave to appeal had not been sought.

On November 10, 2015, the trial judge conducted a case management conference and scheduled a December 15, 2015 trial date. At the same time, the judge denied Tobia's motion for a stay of the proceedings.

---

[10] That same month, Tobia filed a federal lawsuit against the trial judge, Lisa, and Lisa's attorney, alleging civil rights violations. The complaint was later amended to include, among others, additional superior court judges as defendants.

A-1071-16T4

In December 2015, Tobia moved for: the trial judge's disqualification; the vacation of all orders entered by the trial judge; and a stay of the trial. A few days later, Tobia filed an in limine motion, seeking the release to him of additional marital assets so he could retain counsel; he again sought a stay of the trial and for a hearing to determine whether he was indigent or had the ability to pay as required by existing support orders. Within a few days, he filed yet another motion, seeking a transfer of venue as well as the vacation of all prior orders entered by two superior court judges who previously presided over the matter. On December 15, all these motions were denied, except that the judge granted Tobia's counsel's request to be relieved; the judge also allowed a release to Tobia of $50,000 from the marital estate so he could retain trial counsel. The trial commenced that day.

The next day, the trial judge entered a judgment of divorce, bifurcating the cause of action for divorce from the issues of alimony, support, equitable distribution and all other financial issues. Tobia filed a notice of appeal and, again, we sua sponte dismissed that appeal because the identified order did not result in a resolution of all issues as to all parties.

In January 2016, the judge entered an order to show cause based on Lisa's assertion that Tobia had been liquidating funds from marital accounts in

A-1071-16T4

violation of prior court orders. The judge also immediately froze all Tobia's bank accounts. Three days later, Tobia filed a Chapter 7 bankruptcy petition, and a trustee was appointed. The day after that, Tobia withdrew a substantial sum from marital accounts. On January 21, 2016, the trial judge conducted a hearing regarding those withdrawals, which exceeded $50,000. At the hearing, Tobia refused to respond to the judge's questions, citing his Fifth Amendment rights. The judge advised Tobia that he would draw an adverse inference from his failure to respond.

On February 1, 2016, Tobia filed papers that purported to effect a removal of this matrimonial action to the federal district court. The district judge, however, issued an order on February 17, 2016, that rejected Tobia's attempt to remove the matter. Tobia's request for a stay of the trial was denied by the matrimonial judge on February 22, 2016.

Overall, the trial consumed eight non-consecutive days, ending in February 2016. In April 2016, a few weeks before the parties' written summations were due, Tobia applied for a release of funds from the marital estate for legal fees and for an adjournment of the trial. That relief was denied.

In May 2016, the bankruptcy trustee moved to intervene in the divorce proceedings so that he could be heard on equitable distribution issues. The trial

9

judge denied the motion but allowed the trustee to submit a written summation containing his position in the matter. By the end of the month, the bankruptcy court granted Lisa's motion for relief from the automatic bankruptcy stay, retroactive to the day the Chapter 7 petition was filed.

In June 2016, the trial judge conducted two support-enforcement hearings. The judge found that Tobia had the ability to pay and incarcerated him not only because of his failure to pay spousal and child support but also because he had failed to provide proof of life insurance. The record does not clearly reveal when or on what condition Tobia was released. The following month, Tobia failed to appear for another enforcement hearing and a warrant was issued for his arrest. Tobia was arrested on August 6; during the incarceration that followed, Tobia was periodically brought before the trial court to have the circumstances reviewed; he repeatedly refused to answer questions about his assets and employment. During his incarceration, Tobia made a number of applications for relief to both this court and the Supreme Court; those applications were all denied.

On September 6, 2016, the trial judge entered a final judgment of divorce, resolving all outstanding matters. Tobia was released on September 26, 2016,

when his newly-retained counsel promised there would be compliance with the court's orders.

III

In his appeal, Tobia argues the trial judge erred or abused his discretion by: (a) bifurcating issues; (b) conducting a trial without jurisdiction; (c) imputing income to him "that was too high and based on a fabrication, since he had retired two . . . years prior" to the filing of the divorce complaint; (d) awarding alimony and in fixing the amount of alimony and child support; (e) distributing marital assets in a manner that was "inequitable" and left him "indigent"; (f) failing to provide him with parenting time or a right to contact the children while obligating him to contribute to the children's education costs; (g) denying him "counsel fees from parties' equitable distribution" and access to marital funds to retain counsel prior to trial; (h) holding a trial before discovery was completed; (i) refusing to vacate orders entered by prior judges and failing to disqualify himself; and (j) ordering the sale of the parties' two "unleveraged" homes without a plenary hearing. We find no merit in these arguments and provide only the following comments as to the first seven points.

A

As for Tobia's argument regarding bifurcation, we agree with the trial judge that, under <u>Rule</u> 5:7-8, good cause existed and extraordinary circumstances were presented because of the case's age and Tobia's extreme litigiousness, which had not only delayed and convoluted the proceedings but had the potential to continue to do so. In explaining his ruling, the judge referred to there having been more than seventy court appearances, fifteen applications by Tobia for orders to show cause, numerous applications by Tobia for domestic violence retraining orders and, of course, the proceedings in federal district court and federal bankruptcy court.

Because it caused no prejudice to Tobia and there were numerous good reasons for its entry, we affirm the bifurcation order substantially for the reasons set forth by the trial judge in his oral decision.

B

Tobia contends that because he filed a notice of appeal in this court, a bankruptcy petition in the bankruptcy court, and a petition for removal in federal district court, the trial court was deprived of jurisdiction to conduct the divorce trial that led to the final judgment now under review. To put these arguments in context, we note that the trial started on December 15, 2015, and proceeded on

December 16 and 17, 2015, January 20, 21, and 25, 2016, and February 1 and 4, 2016. The notice of appeal was submitted to the Clerk's Office on January 5, 2016, the bankruptcy petition was filed on January 18, 2016, and the petition for removal was filed on February 1, 2016. So, despite the cloud that these extraneous filings had on the trial, we start by acknowledging that they had no impact whatsoever on that part of the trial that occurred on December 16 and 17, 2015, because those three filings – (1) the notice of appeal; (2) the bankruptcy petition; and (3) the removal petition – occurred after those first two days of trial. For the reasons that follow, we also conclude that not one of these three filings impacted the trial court proceedings that occurred thereafter.

(1)

The January 5, 2016 notice of appeal ostensibly sought review of the order that bifurcated the claim for a divorce from the other issues in this matrimonial action. That order, of course, was not a final or appealable order because, by its very nature, it did not dispose of all issues as to all parties. See, e.g., Grow Co. v. Chokshi, 403 N.J. Super. 443, 457-58 (App. Div. 2008). Tobia had no right to file the notice of appeal; he could only have obtained review of that order by moving for leave to appeal, an event that would not deprive the trial court of jurisdiction until such time as this court granted leave to appeal.

13

Ordinarily, the filing of a notice of appeal places supervision of the matter in the appellate court's hands until such time as the notice of appeal is dismissed or the matter remanded. See R. 2:9-1(a). But we have not interpreted this Rule as depriving a trial court of jurisdiction when a party has improperly filed a notice of appeal. Savage v. Weissman, 355 N.J. Super. 429, 435 (App. Div. 2002).

Even were that not so, Tobia never actually "filed" a notice of appeal. Besides the fact that the Clerk's Office informed him that it appeared the trial court order identified in the notice of appeal was not final and, therefore, not appealable, the Clerk's office also advised Tobia that he failed to pay the filing fee, without which there could be no filing. Tobia's submission of an improper notice of appeal without a filing fee could not serve to deprive the trial court of jurisdiction.

(2)

Tobia's January 18, 2016 bankruptcy petition triggered the automatic stay provisions of 11 U.S.C. § 362. On January 20, the trial judge acknowledged he was aware of the bankruptcy petition, but the judge properly held that the petition's filing did not operate as a stay of state court matters dealing with support obligations, child custody and visitation, so he limited the testimony that

followed to those discrete issues. The following day, the judge denied Tobia's request for a stay of the trial, concluding that Tobia's bankruptcy filing was calculated as the means of disrupting the trial court proceedings and was filed in bad faith.

To be sure, once filed, a bankruptcy petition casts a large cloud over a state court proceeding. But, here, the bankruptcy court later vacated the automatic stay retroactive to the date of the petition's filing, January 18, 2016. As a result, the bankruptcy proceedings had no impact on the legitimacy of the matrimonial trial.

(3)

Similarly, Tobia's February 1, 2016 petition to remove the matter to federal district court – despite a complete and utter lack of federal jurisdiction – was rightfully ignored by the trial judge. The notice and petition of removal contained in Tobia's appendix – assuming we have been presented with a complete copy – does not state any ground upon which the federal court might exercise federal jurisdiction. The notice's caption invokes 28 U.S.C. §1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (deprivation, under color of state law, of civil rights), neither of which was implicated here. It may be that Tobia claimed he was deprived of due process with regard to <u>the manner</u>

15

in which the state court proceedings were occurring. But federal question jurisdiction is not based on the manner in which state proceedings are conducted, only the nature of the claim removed. What Tobia sought to remove was a divorce action over which federal jurisdiction is not recognized, see Barber v. Barber, 62 U.S. 582, 584 (1859) (in which the Court "disclaim[ed] altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony"); see also Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 383-84 (1930) (recognizing that it "has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce"), except – perhaps – to enforce a decree entered by a state or territorial court, see generally Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel, 490 F.2d 509, 514 (2d Cir. 1973), a circumstance not present when the removal petition was filed. The claim that the federal court could exercise subject matter jurisdiction was patently frivolous.

Moreover, the attempt to remove the matter was grossly out of time. Removal must occur, if at all, within thirty days of the defendant's receipt of the complaint. See 28 U.S.C. § 1446(b). The divorce complaint was filed and served in 2012, and removal was not attempted until nearly four years later. Even if, by some stretch of the imagination, the statutory time-bar could be

16

overlooked, Tobia filed an answer and counterclaim in September 2012, thereby acceding to the exercise of state court jurisdiction over the action. In short, the removal petition was frivolous on its face, and the trial court was entitled to so view it, even if the eventual dismissal of the removal petition did not occur until a few weeks later.[11]

We agree with the trial judge that Tobia acted frivolously and in bad faith by attempting to remove the matter. While the removal petition ostensibly suggested that the proceedings that followed in the trial court were unauthorized, its later dismissal removed any cloud, as the district judge dismissed the removal petition, rather than remand the proceedings to the trial court. Such a disposition demonstrates the district judge viewed the filing as a nullity.

C

Tobia next argues that the trial judge erred not only by imputing income to him but also in the amount of imputed income that was fixed. In examining such a fact-sensitive finding, we must adhere to our obligation to defer to judge-

---

[11] The district judge interpreted Tobia's filing as an attempt to have the district court exercise what would have been, in essence, an appeal of a state court order, in violation of the so-called Rooker-Feldman doctrine. See Rooker v. Fid. Tr. Co., 263 U.S. 413 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983). He also viewed the removal petition as Tobia's attempt to revive claims previously asserted in federal court against the trial judge and other superior court judges.

made findings when supported by adequate, substantial, and credible evidence in the record. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998); Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974).

So limited, we note that Lisa provided considerable evidence, including her own testimony, the testimony of a vocational expert, and Tobia's deposition testimony, to support her contention that despite his having ostensibly quit his job, Tobia would not have retired, as he alleged he had; during the course of the marriage there was no understanding that Tobia would retire in his mid-forties.

The evidence Lisa presented also supported the amount imputed, while Tobia chose not to testify and provided no expert testimony to refute Lisa's evidence. A matrimonial judge is certainly entitled to impute income to a spouse who is voluntarily unemployed or underemployed. See Tash v. Tash, 353 N.J. Super. 94, 99 (App. Div. 2002); Bencivenga v. Bencivenga, 254 N.J. Super. 328, 331 (App. Div. 1992). Only in this way may a court arrive at a "fair and just allocation of the support obligation." Caplan v. Caplan, 182 N.J. 250, 269 (2005). Indeed, it is not a party's actual income but that party's earning capacity that factors into the devising of an equitable level of support. Halliwell v. Halliwell, 326 N.J. Super. 442, 448 (App. Div. 1999).

Of relevance also is whether the party had "just cause" to be unemployed or underemployed. Gnall v. Gnall, 432 N.J. Super. 129, 158 (App. Div. 2013). This requires a consideration of, among other things, "the employment status and earning capacity" of that party had the relationship "remained intact," and "the reason for and intent behind the voluntary underemployment or unemployment." Caplan, 182 N.J. at 268. The factfinder is entitled to consider "previously announced plans to retire at an early age, health of the parties, whether one party would remain out of the workforce to care for the children and other similar considerations that the intact family had or would have contemplated." Ibid.

The judge was presented with substantial and credible evidence that Tobia was intentionally unemployed as part of a legal strategy to deprive Lisa of support, and that Tobia woefully failed to demonstrate that his alleged early retirement – he was in his mid-forties when the action was commenced and fifty-one years old at the end of the trial – was reasonable, in good faith, or commensurate with what would have occurred but for his bad faith desire to deprive Lisa of support. See N.J.S.A. 2A:34-23(j)(2) (declaring that when an obligor "seeks to retire prior to attaining the full retirement age as defined in this section, the obligor shall have the burden of demonstrating by a

preponderance of the evidence that the prospective or actual retirement is reasonable and made in good faith").

The record amply demonstrated that Tobia had an earning capacity consistent with, if not greater than, the judge's imputation of $2,500,000 in annual income. Lisa provided testimony regarding Tobia's base annual salary from 2003 to 2011, at which time he voluntarily stopped working without cause:

2003: $3,635,966

2004: $3,018,159

2005: $2,167,089

2006: $854,584

2007: $1,389,884

2008: $1,400,000

2009: $1,500,000

2010: $2,334,000

2011: $2,200,000

Those figures, however, include only reported W-2 income and not unexercised/unrealized options or monetary long-term incentives which were awarded but not then paid. For example, Lisa testified that Tobia told her in

20

2007 that around that time, when considering all other sources, his compensation package for two years was $30,000,000.

Based on this and a good deal more evidence with which we need not burden the reader, Lisa's employability expert concluded without contradiction that Tobia was capable of earning at least two to three million dollars annually and had a demonstrated history of compensation in the two to five million dollar range. The credible evidence on which the judge relied fully supported his imputation of income to Tobia in the amount fixed; that finding commands our deference.

D

Tobia challenges the trial judge's award to Lisa of open durational alimony and the amounts fixed for alimony and child support. These arguments are also without merit.

The judge weighed the factors set forth in N.J.S.A. 2A:34-23(b), and concluded that open durational alimony was appropriate. This was a sound determination when considering the parties' ages, the length of the marriage (twenty-three years), Tobia's superior economic position because of his earning capacity, Lisa's absence from the workplace outside the home for more than

twenty years while attending to parental responsibilities, and the fact that, when employed outside the home, Lisa never earned more than $50,000 annually.

Alimony is a "flexible concept." Gayet v. Gayet, 92 N.J. 149, 154 (1983). Based on the evidence, the judge concluded that $80,000 per month in alimony was fair and equitable, recognizing the parties' lavish lifestyle, to which we have only briefly alluded. See Mani v. Mani, 183 N.J. 70, 80 (2005). The judge's findings on both the need for alimony, the amount imposed, as well as the child support award of $10,000 per month, were all discretionary determinations entitled to our deference when – as here – they are supported by the applicable legal principles and based on credible evidence. See Gordon v. Rozenwald, 380 N.J. Super. 55, 76 (App. Div. 2005); Cox v. Cox, 335 N.J. Super. 465, 473 (App. Div. 2000).

E

Tobia argues that the judge failed to equitably distribute the parties' assets. We disagree because, as with many of the issues presented, our review is limited. Wadlow v.Wadlow, 200 N.J. Super. 372, 377 (App. Div. 1985). Our standard of review precludes intervention absent the trial judge's misapplication of the law or when the ruling is not supported by sufficient credible evidence in the record. Rothman v. Rothman, 65 N.J. 219, 232-33 (1974).

Tobia contends the judge awarded Lisa "all of the parties' property and assets" and saddled him with "all debts and obligations." That assertion misinterprets the judge's ruling. The judge equally divided the parties' marital property, including bank accounts, brokerage accounts, private equity accounts, and marital retirement assets. Once so divided, the judge then made adjustments based on credits owed to Lisa for: advances allowed to Tobia; unpaid support; so-called Mallamo[12] credits for the underpayment of pendente lite support; expert fees; and counsel fees. The judge also ordered the sale of certain marital vehicles to satisfy Tobia's arrears and support obligations. There was considerable support for these determinations, and Tobia has provided no principled reason why we should second-guess the fair and equitable conclusions drawn by the experienced trial judge.

F

Tobia additionally contends that the judge "egregiously abused [his] discretion in child custody, parenting time, and education costs determinations

---

[12] Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995) (recognizing that pendente lite support orders are subject to modification at trial). Because the pendente lite orders required a significantly smaller monthly payment to Lisa than determined at trial, the judge had the discretion to compel payment to Lisa of the difference between the pendente lite payments and those required by the final determination. We find no abuse of discretion in the judge's determinations in this regard.

that were inequitable as [he] was provided with no parenting time or contact but was obligated to pay children's education costs." We find no merit in this contention.

First, we note that Tobia voluntarily entered into a 2012 no-contact order that prevented him from interacting with the children. Second, the judge considered the relevant factors in fixing child support and determining that Tobia should pay sixty-six percent of any shortfall in the children's college educations once the 529 college fund plans were exhausted. The very existence of the 529 plans demonstrated the parties' expectations that their children were financially suited for and would attend college.

Implicit in the judge's determinations was a consideration of the Newburgh factors[13] that Tobia now claims was lacking. We also find implicit in the judge's findings that the oldest child, who was still attending college, remained unemancipated as of the date of the judgment.

G

Tobia also argues that the trial judge "egregiously abused [his] discretion in denying [him] counsel fees [as an advance from his share of equitable

---

[13] Newburgh v. Arrigo, 88 N.J. 529 (1982).

A-1071-16T4

distribution] . . . [and] deprived [him] of the opportunity to retain counsel . . . throughout the case and at trial." This argument lacks merit.

The record demonstrates not only that Tobia had the wherewithal to retain counsel, but also that he was awarded advances from equitable distribution in May 2013 ($100,000), August 2014 ($150,000), and December 2015 ($50,000), and elected not to retain trial counsel despite being allowed a fund of $1000 per day to do so. Tobia also received other large advances from his portion of equitable distribution during the suit's pendency. Moreover, the record reveals that Tobia retained numerous attorneys during the course of the litigation, thereby belying his claim that circumstances forced him to be self-represented.

\* \* \*

We find insufficient merit in Tobia's remaining arguments to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1071-16T4